MOEL LAH FAKHOURY LLP
Hanni M. Fakhoury (State Bar No. 252629)
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone:   (510) 500-9994
Email:        hanni@mlf-llp.com

Attorneys for Jonathan Soong

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** 3:22-CR-00372-SI |
| Plaintiff, | **DEFENDANT'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| JONATHAN SOONG, | **Court:**        Courtroom 1, 17th Floor |
| Defendant. | **Hearing Date:**   April 28, 2023 |
| | **Hearing time:**   11:30 a.m. |

Pursuant to Northern District Criminal Local Rule 32-5(c), Mr. Soong files this response to the government's sentencing memorandum, to address two specific points raised by the government.

First, the government writes in its introduction that Mr. Soong "illegally exported to Beihang University…thousands of dollars of flight control and design and optimization software" from 2017 through 2020. *See* Dkt. 38, United States' Sentencing Memorandum ("Gov. Sent. Memo.") at 1. That is incorrect.

As Mr. Soong admitted in his plea agreement, in 2017 a representative from Beihang reached out to him to purchase CIFER. *See* Dkt. 32, Plea Agreement at 3. The contract for the sale was signed on August 4, 2017, and payment of $2,182 was made to USRA on January 2, 2018. *Id.* at 4. Beihang did not activate the software until July 25, 2018, when Mr. Soong sent the software key to the representative. *Id.* That was the only purchase of CIFER by Beihang, and the only illegal export in this case. The government's sentencing memorandum only discusses this one sale of CIFER to

Beihang and does not allege any other sales to Beihang or any other prohibited entity. *See* Gov. Sent. Memo. at 4-7. Mr. Soong acknowledges this sale was a serious mistake, compounded by him diverting software license fees to his individual bank account, and he is deeply remorseful for it. But to be clear, there was only one illegal export to Beihang for a total of $2,182.00 and none of those proceeds were diverted to Mr. Soong's individual bank account. *See* PSR ¶ 22.

Second, the government asserts that the base offense level should be 26 under U.S.S.G. § 2M5.1(a)(1), because "national security controls were evaded" when Mr. Soong exported CIFER to Beihang. Gov. Sent. Memo. at 11. Again, it is wrong.

Mr. Soong's sentencing memorandum explained in detail why the base offense level should be 14, not 26. *See* Dkt. 36, Defendant's Sentencing Memorandum, Motion for Downward Variance and Objection to the Presentence Investigation Report ("Def. Sent. Memo.") at 17-22. In short, under U.S.S.G. § 2M5.1, if the offense involves either (1) the evasion of "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons" or (2) "a financial transaction with a country supporting international terrorism," the base offense level is 26. U.S.S.G. § 2M5.1(a)(1). In all other cases, the base offense level is 14. U.S.S.G. § 2M5.1(a)(2).

No "national security controls" were evaded when CIFER was exported to Beihang. The few reported cases analyzing the phrase "national security controls" in § 2M5.1(a)(1) have found it applied when an export violated an Executive decision to embargo trade with a country deemed a national security threat. Unsurprisingly, these cases all involved export to countries classified as a state sponsor of terrorism. *See United States v. Hanna*, 661 F.3d 271, 293 (6th Cir. 2011); *United States v. Elashyi*, 554 F.3d 480, 509 (5th Cir. 2008); *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997); *United States v. Sevilla*, 2006 WL 3486872, at *3 (N.D. Ill. Nov. 29, 2006); *United States v. Min*, 2000 WL 1576890, at *2 (S.D.N.Y. Oct. 23, 2000). Here, there was no export to a country deemed a state sponsor of terrorism.

Nor is the government correct that mere "placement of an entity on the Entity List itself supports that that entity is viewed a risk to national security." Gov. Sent. Memo. at 11. As the government acknowledges later in that same paragraph, while the initial publication of the Entity List in 1997 was concerned with weapons of mass destruction, "grounds for inclusion on the Entity List

have *expanded* to activities sanctioned by the State Department and activities contrary to U.S. national security and/or foreign policy." *Id.* (citing U.S. Department of Commerce, Bureau of Industry and Security, "Entity List.") (emphasis added).[1] The fact that the Commerce Department itself distinguishes between "national security" and "foreign policy" necessarily suggests the two are different concepts. *See Corley v. United States*, 556 U.S. 303, 315 (2009) (noting use of two terms within one statutory subsection means "Congress used the distinct terms very deliberately" and the terms "plainly cannot be synonymous."). And again the government's own brief quotes DOJ comments about China as being a threat to this country's "information and intellectual property, and to our economic vitality" and "economic security." Gov. Sent. Memo. at 12. "Economic vitality" and "economic security" are of course important concerns, but they are not comparable to the "national security controls" that trigger the base offense level in § 2M5.1(a)(1), which the Guidelines deem as the equivalent—by virtue of triggering a heightened base offense level of 26—of evading controls "relating to the proliferation of nuclear, biological, or chemical weapons," or transactions with countries "supporting international terrorism." U.S.S.G. § 2M5.1(a)(1).

Citing 88 Fed. Reg. 13673, the government argues "the listing for Beihang University on the Entity List *now* specifically cites to 15 C.F.R. § 744.11, which explicitly requires a license for exports to entities that are deemed to pose a risk to "national security or foreign policy interests of the United States." Gov. Sent. Memo. at 12 (emphasis added). But its cited Federal Register notice was only published last month, on March 6, 2023, more than six years after the initial contact between Mr. Soong and Beihang, and five years after the export that forms the basis of this case.

The fact the entry for Beihang was amended recently to include a citation to 15 C.F.R. § 744.11—which specifically requires a license for exports to entities deemed to pose a risk to "national security or foreign policy interests of the United States"—suggests the previous omission of a citation to 15 C.F.R. § 744.11 was deliberate. *See* Def. Sent. Memo. at 20. The canons of statutory interpretation apply when interpreting regulations. *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1157 (9th Cir. 2004). "When Congress uses particular language in one part of a statute and omits it

---

[1] *Available at* https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern/entity-list.

1   elsewhere, it is generally presumed that Congress acts intentionally and purposely in the disparate

2   inclusion or exclusion." *Tin Cup, LLC v. United States Army Corps of Engineers*, 904 F.3d 1068,

3   1073 (9th Cir. 2018) (quotations and citation omitted). Whatever the government's reasons now in

4   2023, Beihang's placement on the Entity List at the time of the offense in 2017 and 2018 was not due

5   to "national security" concerns.[2]

6         Moreover, a "retrospective increase in the Guideline range applicable to a defendant creates a

7   sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Peugh v. United States*,

8   569 U.S. 530, 544 (2013). Thus, the Guidelines themselves state "[i]f the court determines that use of

9   the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post*

10  *facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on

11  the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). So the fact that

12  Beihang is on the Entity List in 2023 due to concerns over "national security" cannot be used to

13  increase the Guideline range—which comes with the "risk of a higher sentence"—for conduct

14  occurring more than five years ago by adopting the heightened base offense level in U.S.S.G. §

15  2M5.1(a)(1).

16        Finally, the government is mistaken that the act of exporting CIFER, "an advance technology

17  tool," involved "great planning and cunning" and is thus a factor to be used in "determining the

18  sentence within the applicable guideline range." Gov. Sent. Memo. at 13 (citing U.S.S.G. § 2M5.1

19  app. m. 2.). As an initial matter, neither the government nor probation are recommending the Court

20  impose a sentence "within the applicable guideline range" as they have calculated it with the

21  heightened base offense level. The government overstates how the improper export to CIFER

22  "threatened a security interest of the United States." Gov. Sent. Memo. at 13. Nor was there "great

23  planning and cunning." The offense involved a handful of emails sent on monitored USRA

24  computers and a transaction consummated through official USRA payment channels. The offense

25

26  _____

27  [2] As explained in Mr. Soong's sentencing memorandum, Beihang's placement on the Entity List cited
    license requirements for the "proliferation of certain rocket systems, or unmanned aerial vehicles." 15
    C.F.R. § 744.3(d)(1); *see also* Def. Sent. Memo. at 20-21. Again, those concerns are certainly

28  important but do not fall within the categories of controls that trigger the heightened base offense
    level in U.S.S.G. § 2M5.1(a)(1).

1    was sloppy rather than cunning: Mr. Soong sent the wrong license key to Beihang and ultimately

2    confessed his misdeeds to USRA and on his own initiative, admitted his diversion of funds. As

3    USRA explained itself to DOJ, the export did not involve "items controlled for nuclear proliferation

4    or missile technology reasons to a proliferator country;" "items known to be used in the construction

5    of weapons of mass destruction," exports to "a foreign terrorist organization or specially designated

6    global terrorist," or "exports of military items to a hostile foreign power." Dkt. 36-7, Def. Sent.

7    Memo. Exh. G, USRA-000803. The Commerce Department classified CIFER as "EAR 99," which

8    "generally consist of low-technology consumer goods and do not require a license in most

9    situations."[3] The algorithms at the heart of CIFER are in the public domain. Dkt. 36-5, Def. Sent.

10   Memo. Exh. E, NASA-000065. Anyone with a computer can go online and purchase a textbook

11   containing the algorithms for $120 from Amazon.com.[4]

12        Mr. Soong understands he made a serious and inexcusable mistake and is deeply remorseful for

13   his actions. But he does not need to go to prison. He respectfully requests this Court place him on

14   probation for five years.

15

16        Dated:    April 25, 2023                    Respectfully submitted,

17                                                     MOEEL LAH FAKHOURY LLP

18

19

20                                                     Hanni M. Fakhoury
                                                       Attorneys for Jonathan Soong

21

22

23

24

---

25

26   [3] U.S. Department of Commerce, International Trade Administration, "Export Control Classification
     # (ECCN) and (EAR99), *available at* https://www.trade.gov/eccn-and-export-administration-
27   regulation-ear99.

     [4] Mark Tischler, et. al., "Aircraft and Rotorcraft System Identification," 2nd Ed., AIAA Education
28   Series, 2012, *available at* https://www.amazon.com/Aircraft-Rotorcraft-System-Identification-
     Education/dp/1600868207.